UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| NICOLE HINSON, Individually and as Next Friend of C.H., a Minor; and CAMERON HINSON, Texas residents, <br><br> Plaintiffs <br><br> v. <br><br> DOREL JUVENILE GROUP, INC., a Massachusetts corporation, <br><br> Defendant. | Case No. 2:15-cv-00713 |

**DEFENDANT DOREL JUVENILE GROUP, INC.'S MOTION FOR
SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM IN SUPPORT**

Defendant Dorel Juvenile Group, Inc. ("Dorel") is entitled to summary judgment in two different respects. First, Plaintiffs have failed to establish that the injuries sustained by C.H. in this crash were foreseeable to Dorel, as required for their claim of marketing defect. Second, even if a reasonable jury could find in favor of Plaintiffs on their claim of marketing defect, Plaintiffs have failed to establish a submissible case of punitive damages under the incredibly high standard set by Texas law, entitling Dorel to partial summary judgment at a minimum.

**STATEMENT OF ISSUES**

1.   Is Defendant entitled to summary judgment on Plaintiffs' failure to warn claim when C.H.'s injuries were not foreseeable to Dorel?

2.   Have Plaintiffs failed to set forth sufficient support for a punitive damages charge when it is undisputed the subject car seat passed federal safety tests and there is

no clear and convincing evidence Defendant deliberately chose to ignore an identified and extreme risk?

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Plaintiff C.H. was in a motor vehicle accident on May 15, 2013. (Am. Compl., Doc. No. 41 at ¶ 8.)

2. The subject accident was primarily a frontal crash. (Transcript of 2/23/16 Deposition of D. Phillips, Ex. A at 99:7-9.)

3. Plaintiff C.H. suffered a spinal cord injury at the T12 level and lower thoracic/upper lumbar spine. (Transcript of 3/18/16 Deposition of M. Hoffman, Ex. B at 21:10-16.)

4. Plaintiff C.H. was riding in a Summit-model child car seat manufactured by Dorel Juvenile Group, Inc. (Am. Compl., Doc. No. 41 at ¶¶ 7, 9.)

5. The Summit's instructions and carton art indicate it is for use only in a forward-facing direction, for children who are at least 34 inches tall, weigh at least 22 pounds, and who are at least one year of age. (Instructions and Carton Art, Ex. C (Excerpts from Exs. 17 and 18 to Transcript of 3/1/16 Deposition of T. Emerson).)

6. Plaintiffs claim that the Summit contained a marketing defect because Dorel failed to instruct / warn them that children are "safer" in a rear-facing direction when they are "very young" – under the age of 2 - and that the Summit should therefore only be used by children over 2. (*See* Am. Compl., Doc. No. 41 at ¶ 14-15; Transcript of 3/15/16 Deposition of G. Whitman, Ex. D at 91:22-92:5.)

7. Plaintiffs further allege that had Dorel instructed / warned them not to use the Summit with C.H. before the age 2, that Plaintiffs would have used a rear-facing convertible seat at the time of the accident rather than the Summit and would not have been injured. (*See id.*; *see also* Ex. B. at 13:17-23, 39:15-40:10.)

8. All child car seats, in order to be sold in the United States, must pass the performance requirements of Federal Motor Vehicle Safety Standard 213 ("FMVSS 213"), a safety regulation enacted by the National Highway Traffic Safety Administration ("NHTSA"). (Transcript of 1/28/16 Deposition of R. Glover, Ex. E at 207:8-21.)

9. Among other requirements, FMVSS 213 tests child car seats in frontal crashes, and requires them to meet performance criteria designed to protect children against head and chest injuries. (Ex. D at 95:5-11.)

10. When tested by NHTSA, the Summit met the FMVSS 213 criteria for prevention of head and chest injury. (*Id.*; *see also* Ex. D at 48:19-22; Ex. E at 207:8-21.)

11. Dorel has run its own frontal tests on about a thousand Summit seats to ensure quality and compliance with federal injury prevention requirements. (Ex. E at 87:16-88:9.)

12. C.H.'s Summit child seat has never been recalled. (Ex. D at 48:23-25.)

13. At the time of the subject accident, the Summit had been on the market since about 2000. (Ex. E at 57:3-4.)

14. About 2 million Summit child car seats have been sold since it first went on the market. (*Id.* at 73:3-9.)

15. At the time of the subject accident, the Summit had never had a reported case of any child suffering a spinal cord injury. This includes any T12 level injuries like that sustained by C.H. (*Id.* at 200:5-7.)

16. Plaintiffs' proffered car seat expert knows of no situation other than this one in which the child suffered a lower thoracic, upper lumbar spinal cord injury in a forward facing five-point harness seat like the Summit, and he has investigated several hundred cases. (Ex. D at 75:5-16.)

17. The location of C.H.'s thoracic spinal cord injury was about 2/3 of the way down his back. (Hoffman Dep. Ex. 6 (showing T12 location versus neck location), Ex. F.)

18. The American Academy of Pediatrics (AAP) and certain researchers have claimed that being rear-facing protects children from spinal cord injuries, but experts for both sides agree that those references are to neck injuries, not thoracic spinal cord injuries. (Ex. D, 57:13-19, 59:23-60:23, 61:1-17, 65:22-66:5; Transcript of 3/23/16 Deposition of W. Van Arsdell, Ex. G at 71:20-72:18.)

19. Upon the release of the AAP's recommendation on remaining rear-facing in 2011, Dorel publicized and accepted it. (Ex. E at 197:18-23.)

20. Dorel believes that a rear-facing child seat can be safer in some accident situations, but not in others. (Ex. E at 69:4-20.)

21. C.H.'s Summit seat was manufactured in 2012. (Ex. G at 26:6-8.)

22. Dorel's labeling for the Summit did not mention the AAP recommendation or specifically prohibit use by children under 2 years of age. (Ex. C.)

23. However, Dorel's website, at the time C.H.'s seat was manufactured, did advise parents of research suggesting children could be safer while rear-facing. (Ex. E 35:15-23.)

24. Furthermore, at the time the AAP made its recommendation, researchers from Australia had found that children in forward-facing child seats did not suffer spinal cord injury without intrusion or gross misuse of the seat. (Ex. D at 88:7-21-89:21.)

25. C.H. did not experience intrusion during this accident (Ex. D at 89:22-25), and Plaintiffs certainly do not concede that they were grossly misusing the Summit child seat.

26. The average child on a standard CDC growth chart is not tall enough to meet the height requirement for the Summit until they are about 2 years old. (CDC Growth Chart, Ex.H.; Ex. D, 93:22-25.)

27. Plaintiffs' experts contend that, had C.H. been rear-facing in this crash, he would not have suffered serious injuries. (Ex. B at 13:17-23, 39:15-40:10.)

## ARGUMENT

Dorel is entitled to entry of summary judgment if the pleadings, the discovery and disclosure materials on file "show[] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In order to avoid summary judgment, the plaintiff "must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial."

*Wright v. Ford Motor Co.*, 508 F.3d 263, 274 (5th Cir. 2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

In diversity cases, a federal court applies the substantive law of the jurisdiction in which it is sitting and federal procedural law. See *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

A. **No Reasonable Jury Could Find in Favor of Plaintiffs on their Claim for Marketing Defect.**

Under Texas law:

> A marketing defect cause of action consists of five elements: 1) a risk of harm that is inherent in the product or that may arise from the intended or reasonably anticipated use of the product must exist; 2) the product supplier must actually know or reasonably foresee the risk of harm at the time the product is marketed; 3) the product must possess a marketing defect; 4) the absence of the warning and/or instructions must render the product unreasonably dangerous to the ultimate user or consumer of the product; and 5) the failure to warn and/or instruct must constitute a causative nexus in the product user's injury.

*USX Corp. v. Salinas*, 818 S.W.2d 473, 482-83 (Tex. App. 1991), writ denied (Feb. 19, 1992). *See also Wright v. Ford Motor Co.*, 508 F.3d 263, 274-75 (5th Cir. 2007).

Although Defendant of course disputes all of the above-elements, for summary judgment purposes, it is sufficient that Plaintiffs' submitted evidence fails to establish element (2).

1. **Plaintiffs Failed to Establish that C.H.'s Injuries Were Foreseeable.**

"Product design and product warnings can take into account accidents occurring before production and sale, but not unforeseeable accidents occurring thereafter." *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 139 (Tex. 2004). "[A] product supplier is not liable for a failure to warn of dangers which were unforeseeable

at the time the product was marketed. Therefore, the plaintiff must show that the product supplier knew or should have known of the risks at the time of marketing." *USX Corp.*, 818 S.W.2d at 483-84.

If allowed to present the evidence at trial, Plaintiffs can certainly show that, before C.H.'s child seat was manufactured, that the American Academy of Pediatrics and others had recommended rear-facing seating as being generally safer, and that Dorel agreed with that recommendation. Indeed, Dorel expects that Plaintiffs will attempt to focus on evidence along these lines, none of which is ultimately relevant. What their own expert has effectively conceded Plaintiffs *cannot* show, however, is that the C.H.'s injury was actually foreseeable to Dorel at the time it decided not to warn against forward-facing usage by children of C.H.'s age.

As noted above, the only types of possible spinal cord risks of which Dorel and all other researchers were aware of at the time C.H.'s seat was made, and which were relevant to rear- versus forward-facing usage, were neck injuries. (SUMF ¶ 18.) C.H. did not suffer a neck injury: he suffered a thoracic spinal cord injury to his T12 vertebra 2/3 of the way down his back. (SUMF ¶ 17.) This sort of injury had never happened before in the Summit and Plaintiffs' expert has admitted that he is not aware of it ever happening before in the history of the world in either the Summit or any seat like it. (SUMF ¶¶ 15, 16.)

Moreover, there is no evidence that Dorel was on notice of or had reason to know of any spinal cord injury of any kind in the Summit. There is no known incident of any previous spinal cord injury involving the Summit, despite over 2 million units sold over

a 15-year period across the United States. (SUMF ¶¶ 14–15.) The Summit passed all federal performance safety tests, including the injury prevention standards for head and chest injury. (SUMF ¶¶ 9–11.)

### 2. The Unforeseeability of C.H.'s Injury Forecloses Plaintiffs' Marketing Defect Claim.

Plaintiffs have a crafted a very unique claim in this case. They do not contend that the Summit is defective in design or manufacture, only that it was defectively marketed because Dorel failed to warn about risks it knew or should have known existed. Plaintiffs' make this claim even though the spinal cord injury they claim C.H. suffered was had never happened before at the time C.H.'s Summit seat was sold; in fact, on this record, it was never seen — period — by anyone, anywhere in the history of automotive medicine. How could such an injury be foreseeable to Dorel, such that it should have motivated Dorel to warn against forward-facing seat usage by children like C.H.?

Plaintiffs have not provided evidence from which a reasonable jury could find in their favor on the second required element of their marketing defect claim: foreseeable risk of injury. Dorel is entitled to summary judgment, particularly when this deficiency is combined with the presumption of non-defectiveness supplied by the Summit's passage of federal safety testing. This latter issue is discussed below.

**B.      Plaintiffs Cannot Present a Submissible Case of Punitive Damages under Texas law.**

**1.      Texas law requires proof that a defendant knew an extreme risk of injury was substantially certain to occur.**

This Court looks to Chapter 41 of the Texas Civil Practice and Remedies Code and to Texas jurisprudence which lays out the substantive elements necessary to support a punitive damages claim. In order to recover punitive damages under Texas law, a plaintiff must prove by clear and convincing evidence that the defendant acted with fraud, malice, or gross negligence. TEX. Civ. PRAC. & REM. CODE § 41.003(a). This burden of proof may not be satisfied by evidence of ordinary negligence, bad faith, and/or a deceptive trade practice. TEX. Civ. PRAC. & REM. CODE § 41.003(b). Clear and convincing evidence of fraud, malice, and/or gross negligence is required. TEX. CIV. PRAC. & REM. CODE § 41.003(a).

Under Texas law, "malice" is defined as a specific intent by the defendant to cause substantial injury to the claimant. TEX. Civ. PRAC. & REM. CODE § 41.001(7). "Gross negligence" is defined as an act or omission:

> (A)    which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
> (B)    of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety or welfare of others.

TEX. Civ. PRAC. & REM. CODE § 41.001(11). "Fraud" is defined as any type of fraud other than constructive fraud. See TEX. Civ. PRAC. & REM. CODE § 41.001(6).

### 2. Dorel's compliance with Federal Motor Vehicle Safety Standards forecloses punitive damages under Texas law.

Dorel's compliance with the applicable federal safety guidelines should bar Plaintiffs' claim for punitive damages. The Federal Motor Vehicle Safety Standards (hereinafter "FMVSS") originated in the Traffic and Motor Vehicle Safety Act of 1966. The Act, and the regulations promulgated from it, describes the scope of the standards as well as the role played by governmental regulatory agencies in ensuring motor vehicle safety. The Act is administered by the National Highway Traffic Safety Administration (hereinafter "NHTSA"), an arm of the Department of Transportation, which was created by Congress to ensure the safety of automobiles for all Americans. *See* 49 C.F.R. Parts 501-594; 49 U.S.C. § 30101.

The FMVSS are expressly intended to reduce deaths and injuries resulting from traffic accidents. The regulations were enacted to "meet the need for motor vehicle safety" and to "protect the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against any unreasonable risk of death and injury in an accident." 49 U.S.C. §§ 30111, 30102(a)(8).

In setting forth the considerations for enacting the FMVSS, 49 U.S.C. § 30111 states:

§ 30111. Standards

> (a) *General Requirements* - The Secretary of Transportation shall prescribe motor vehicle safety standards. Each standard shall be practicable, meet the need of motor vehicle safety, and be stated in objective terms.

> (b)  *Considerations and Consultation* - When prescribing a motor vehicle safety standard under this chapter, the Secretary shall -
>
> > (1)  consider relevant available motor vehicle safety information;
> >
> > (2)  consult with the agency established under Act of August 20, 1958 (Public Law 85-684, 72 Stat. 635), and other appropriate State or interstate authorities (including legislative committees);
> >
> > (3)  consider whether a proposed standard is reasonable, practicable, and appropriate for the particular type of motor vehicle or motor vehicle equipment for which it is prescribed; and
> >
> > (4)  consider the extent to which the standard will carry out section 30101 of this title [which provides that the purpose of the FMVSS requirements is to reduce traffic accidents, as well as deaths and injuries resulting from traffic accidents].

Relying on its staff of automotive engineers, NHTSA promulgates rules and test protocols in the FMVSS. Compliance with such standards is required before manufacturers can sell a child car seat in the United States. *See* 49 C.F.R. § 571.7. NHTSA enforces the "Motor Vehicle Safety Standards and associated regulations, [investigates] possible safety-related defects, and [makes] non-compliance and defect determinations." 49 C.F.R. § 554.1.

The subject crash was primarily frontal. (SUMF ¶ 2.) NHTSA has testing performance standards in frontal crashes that specifically evaluate the risk of head

injury and chest injury. (SUMF ¶¶ 8, 9.) The Summit met all of these performance standards. (SUMF ¶¶ 10, 11.)

Because the Summit meets and/or exceeds the very federal safety standards that are expressly intended to "meet the need for motor vehicle safety" and "to protect the public against unreasonable risk of death and injury," Dorel cannot be considered to have acted with malice, fraud, and/or gross negligence. *See* 49 U.S.C. § 30111, 49 U.S.C. § 30112(a)(8). Denying punitive damages when a manufacturer has complied with federal safety standards is proper. *See Miles v. Ford Motor Co.*, 922 S.W.2d 572 (Tex. App.-Texarkana 1996), *reversed and remanded on other grounds*, 967 S.W.2d 377 (Tex. 1998). In *Miles,* the jury found the subject vehicle was defective in design and awarded punitive damages to the plaintiff, but the Texarkana Court of Appeals reversed the punitive damage award. *Id.* at 578. In arguing against the imposition of punitive damages, Ford relied on NHTSA studies concluding that the design of its seat belts did not pose an increased safety risk for the plaintiff's injury. *Id.* at 583-84. Ford also emphasized that it thoroughly researched, designed, and tested the seatbelt retention device at issue, much as Dorel thoroughly researches and tests its child seats. *See id.* at 583-85. The appellate court held that the evidence presented at trial was barely sufficient to find an award of ordinary negligence and fell far short of demonstrating the requisite gross negligence or malice. *Id.* at 589.

The court took into consideration the undisputed evidence presented at trial that Ford, like Dorel in the case at bar, went to great lengths to determine the relevant risks and benefits of its restraint system and made a decision based on the evidence it had at

the time of manufacture. *Id.* at 589-90. While Ford's decision in *Miller* to use tension eliminators may have arguably risen to the level of ordinary negligence, the court reasoned, it certainly did not demonstrate a conscious indifference to the safety of its customers. *Id.* at 590. The court, without deciding the issue, noted:

> The general rule is that compliance with regulatory standards does not necessarily absolve a manufacturer from ordinary liability for product defects or negligence... But most commentators suggest that compliance with a statutory standard should bar liability for punitive damages. *See* Prosser and Keeton on the Law of Torts,§ 36, at 233 (1984), and particularly footnote 41. ...

*Miles,* 922 S.W.2d at 589, n.7 (emphasis added and citations omitted).

Accordingly, Dorel's compliance with the performance standards of FMVSS 213 should bar punitive damages without need to further consider the issue.

### 3. Texas's statutory presumption relating to standards compliance also forecloses Plaintiffs' claim for punitive damages.

Texas law provides yet another basis for ordering summary judgment on Plaintiffs' claim for punitive damages. Statutory jurisprudence establishes a rebuttable presumption that a product manufacturer is not liable for *any* injuries if it complied with mandatory safety standards or regulations adopted and promulgated by the federal government at the time of manufacture. *See* TEX. CIV. PRAC. & REM. CODE § 82.008. As the law therefore presumes that Dorel's aforementioned compliance with federal standards creates strong and substantial evidence that the subject car seat was not defective, Dorel's passage of the Federal Motor Vehicle Safety Standards performance testing bars any claims by Plaintiffs for punitive damages.

Plaintiffs have yet to produce any evidence that Dorel did not comply with the applicable federal performance test standards, nor could they, so summary judgment on the punitive damages claim is proper.

### 4. Plaintiffs have presented no evidence of "extreme risk."

Plaintiffs' entire case relies upon *general* citations in the literature saying that rear-facing seats *in general* are safer than forward-facing child car seats. Dorel also anticipates that Plaintiffs will improperly cite references in those papers to "spinal cord injuries" in an effort to suggest that injuries like those sustained by C.H. were the reason children ought to be rear-facing.

The truth is quite different. Again, the references in the literature Plaintiffs rely upon are discussing **neck** injuries, not injuries in the lower thoracic spine like that suffered by C.H. (SUMF ¶ 18.) Plaintiffs' experts admitted that *they are not aware of a single example in the history of the world* of a child suffering an injury like C.H. did while riding in a forward facing five-point car seat. It thus makes sense that none of the literature could have been discussing thoracic spinal cord injuries; they simply do not happen in properly-used forward-facing seats like the Summit.

Again, Dorel anticipates that Plaintiffs will cite the fact that Dorel, in 2011, stated that it agreed with the position that rear-facing seats were safer and took steps to educate the public and their employees of that apparent fact. First, it is difficult to see how a company trying to educate others about car seat safety could be characterized as grossly indifferent to safety at the same time. Second, it is undisputed that the literature Plaintiffs' experts cite is not specific to the Summit, does not involve lower thoracic

injuries like that suffered by C.H., and that the Summit meets and comfortably exceeds FMVSS 213 injury criteria for brain injury and chest injury. It is also undisputed that over fifteen years of sales, 2 million in number, Dorel had never seen any injury like C.H.'s thoracic spinal cord injury with the Summit, and even Plaintiffs' experts admitted they have never seen one *at all* in any seat of similar design. Third, and most importantly, even if rear-facing seats are safer, that does not establish any cause of action, much less a basis for punitive damages. A company is not required to release the safest possible product or a safer product than the one it did so long as the product it did release is reasonably safe in the condition provided. *See Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1145 (5th Cir. 1985) (applying Texas law).

Dorel could not have comprehended an "extreme" risk of an injury that had never happened before either in its seat, or, as Plaintiffs will be constrained to admit at trial, in human automotive history. Cases finding knowledge of extreme danger tend to involve companies who have received multiple incidents of similar injuries, or had testing failures that should have put them on notice of a problem. *See, e.g., Gen. Chemical Corp. v. De La Lastra*, 852 S.W.2d 916, 921-22 (Tex. 1993) (evidence of prior case "nearly identical to" the instant wrongful death action, as well as subjective knowledge of "at least nine other incidents of death and/or injury involving" the chemical at issue sufficient to support punitive damages award for failing to warn about risk of death). None of that is present in this case. Plaintiffs may have the right to argue at trial that Dorel should somehow have predicted that which never happened before, but Dorel obviously cannot have known of an "extreme" risk of an injury that has never

happened before, apparently to anyone. No reasonable juror could find by *clear and convincing evidence* that Dorel actually comprehended a risk that had apparently never been comprehended by anyone before this crash.

Similarly, Plaintiff has presented no evidence from which a jury could conclude that Dorel had a "subjective awareness" that selling the Summit would place children at extreme risk. Nobody at Dorel has ever believed such a thing, and Plaintiffs have no evidence to the contrary. Rather, the evidence shows that the issue of rear-facing versus forward facing was a complete non-sequitur to the Summit as far as Dorel was concerned. The Summit had excellent test scores on head / brain and chest injury, met all safety tests for frontal crashes (further giving a presumption of non-defectiveness), had a perfect safety record, was never recalled, and had shown itself, over 15 years and 2 million sales, to be nothing other than a well-designed, well-performing seat.

Plaintiffs' attempt to bootstrap a general policy statement about forward-facing versus rearward-facing seats into subjective awareness of a problem with the Summit does not withstand scrutiny. Plaintiffs' conspiracy theories could not support even a preponderance of the evidence on this issue, much less the exceedingly tough clear and convincing standard. No reasonable jury could find punitive damages on this record.

## **CONCLUSION**

Plaintiffs' sole claim of marketing defect relies upon Dorel's failure to foresee a freak injury to C.H.'s spinal cord that has never happened before. If this case does not fail to meet the foreseeability standard as a matter of law, it is difficult to understand

what case could. Regardless, the record evidence is not sufficient to establish a clear and convincing case for exemplary damages.

Defendant's motion should be granted.

                                              Respectfully submitted,

                                        /s/ Jonathan Judge
                                        Anthony A. Avey (Attorney-in-Charge)
                                        AVEY & ASSOCIATES, PLLC
                                        Texas State Bar No. 00790250
                                        14255 Blanco Road
                                        San Antonio, Texas 78216
                                        Telephone: (210) 308-6600
                                        Facsimile: (210) 308-6939
                                        tavey@aveylaw.com

                                        Jonathan Judge (pro hac vice)
                                        Matthew G. Schiltz (pro hac vice)
                                        SCHIFF HARDIN LLP
                                        233 S. Wacker Drive, Suite 6600
                                        Chicago, Illinois 60606
                                        Telephone: (312) 258-5500
                                        Facsimile: (312) 258-5600
                                        jjudge@schiffhardin.com
                                        mschiltz@schiffhardin.com

                                        **ATTORNEYS FOR DEFENDANT**
                                        **DOREL JUVENILE GROUP, INC.**

]

## **CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing to be filed on May 2, 2016, with the Clerk of Court using the CM/ECF System, which will automatically send e-mail notification of such filing and a link to a copy of the document to all attorneys of record.

/s/ Jonathan Judge  
Jonathan Judge
